# STATE OF MICHIGAN

# COURT OF APPEALS

TUDOR INSURANCE COMPANY,

      Plaintiff/Counterdefendant/Cross-
      Defendant-Appellee,

and

CARMEN OTERO, by Guardian WANDA RUIZ,

      Intervening Plaintiff/Cross-
      Plaintiff-Appellant,

v

PM SERVICES, INC., formerly known as
ALTMAN MANAGEMENT COMPANY,

      Defendant/Counterplaintiff/Cross-
      Plaintiff,

and

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURG, PA,

      Defendant/Cross-
      Defendant/Appellee.

UNPUBLISHED
August 21, 2018

No. 335841
Wayne Circuit Court
LC No. 13-010270-CK

---

TUDOR INSURANCE COMPANY,

      Plaintiff/Counterdefendant/Cross-
      Defendant-Appellee,

and

CARMEN OTERO, by Guardian WANDA RUIZ,

      Intervening-Plaintiff/Cross-
      Plaintiff,

v

PM SERVICES, INC., formerly known as

No. 335890
Wayne Circuit Court
LC No. 13-010270-CK

-1-

ALTMAN MANAGEMENT COMPANY,

        Defendant/Counterplaintiff/Cross-
        Plaintiff-Appellant,

and

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

        Defendant/Cross-Defendant-
        Appellee.

_____

Before:  SWARTZLE, P.J., and SHAPIRO and BOONSTRA, JJ.

PER CURIAM.

In these consolidated cases,[1] Wanda Ruiz, as guardian of Carmen Otero, and PM Services, Inc., f/k/a Altman Management Company (Altman), appeal the trial court's orders granting the motions for summary disposition filed by Tudor Insurance Company (Tudor), and National Union Fire Insurance Company (National Union). Tudor and National Union are the primary and excess insurers respectively of Altman against whom plaintiff has a substantial arbitration award. They denied coverage to Altman asserting that it had failed to provide them with timely notice of the suit as required by the respective policies and that as a result of that failure, a default was entered thereby depriving them of the opportunity to defend the claim. Otero and Altman then sought a determination that Tudor and National Union owed coverage to Altman. After discovery, Tudor and National Union filed motions for summary disposition. The trial court concluded that they did not owe coverage and dismissed the cases. We affirm.

## I. FACTUAL BACKGROUND

In the underlying tort case, Otero alleged that on January 26, 2010, she was severely injured as a result of a carbon monoxide leak in a building managed by Altman. For reasons that will be discussed below, a default judgment was entered against Altman and damages in the

---

[1] In Docket No. 335841, Wanda Ruiz, as guardian of Carmen Otero, appeals the trial court's order granting National Union Fire Insurance Company's motion for summary disposition, the order granting Tudor Insurance Company's motion for summary disposition, and a final order of judgment entered on November 8, 2016. In Docket No. 335890, Altman appeals the trial court's order granting National Union Fire Insurance Company's motion for summary disposition, the order granting Tudor Insurance Company's motion for summary disposition, and a final order of judgment entered on November 8, 2016. We issued an order consolidating the cases. *Tudor Ins Co v Altman Mgt Co*, unpublished order of the Court of Appeals, issued December, 14, 2016 (Docket Nos. 335841 and 335890).

amount of $3.5 million were ultimately awarded in an arbitration in which neither insurer participated.

Altman manages many buildings and retained AON Risk Insurance Services West, Inc., (AON), an insurance brokerage firm, to find insurance for its various properties and assist in processing claims and risk management. AON hired a wholesale insurance broker, Westrope & Associates (Westrope), to locate appropriate policies for the subject building. Westrope advised AON that it could obtain primary coverage of up to $1 million from Tudor and an excess policy covering losses up to $25 million from National Union. Altman purchased these policies.

Otero's suit against Altman was filed on June 6, 2011, and timely served. Altman forwarded the summons and complaint to AON, but AON failed to notify Westrope or either insurer of the claim.[2] Altman was unaware of AON's failure, and believing that Tudor was defending the case, did not take independent action to answer the complaint. Thus, the complaint was not answered and Otero entered a default against Altman on July 25, 2011. The default was served on Altman on August 12, 2011.

A little over six months later, on February 29, 2012, Otero filed a motion for default judgment, requesting damages in the amount of $1 million. A week later, Altman notified AON of the motion for default judgment, and AON forwarded a copy of the motion to Tudor on March 6, 2012. Tudor assigned an attorney to defendant Altman, subject to a reservation of rights. On March 14, 2012, the attorney filed a motion to set aside the default, but the trial court denied the motion. The court stated that as a result of the default, Altman could not contest liability but that it remained entitled to a trial on damages.

Nearly a year later, on May 30, 2013, AON notified National Union of the lawsuit against Altman. National Union promptly denied coverage based on the delay in notification. In August 2013, Otero's lawsuit went to case evaluation and the panel issued a case evaluation award of $10 million. Altman rejected the evaluation. On September 24, 2013, Altman notified National Union that an award against Altman would likely exceed its coverage with Tudor. Subsequently, Altman and Otero agreed to submit the damages issue to arbitration, which resulted in a $3.5 million award in favor of Otero.

Tudor then sought a declaratory judgment contending that it had no obligation to defend or indemnify Altman under its policy because Altman breached its duties under the contract by failing to report the service of the complaint prior to the entry of default.[3] Altman filed a

---

[2] The original contract between Altman and AON specifically disclaimed any responsibility by AON to notify insurers of claims. However, as was determined in a related suit between AON and Altman, "the parties, through their affirmative conduct, modified the terms of the [contract] and that AON waived its right to enforce the provision disclaiming its obligations to report claims to Altman's insurers." *Altman Mgt Co v AON Risk Ins Servs West, Inc*, unpublished per curiam opinion of the Court of Appeals, issued September 20, 2016 (Docket No. 328598), pp 4-5.

[3] The notice provision contained in the Tudor policy provides in pertinent part as follows:

counterclaim against Tudor arguing that it was entitled to a declaratory judgment that Tudor was required to defend the lawsuit and pay the arbitration award. The trial court granted Otero's motion to intervene, and she filed a complaint against Tudor and National Union asking the court to enter a declaratory judgment against Tudor for the $1million policy it issued to Altman and against National Union based on the excess coverage it issued to Altman.

In addition to documentary evidence, the trial court considered the testimony of several witnesses. AON's casualty consultant, Wayne Brinkman, testified that Todd Mannschreck, claims manager for Westrope, told him that Altman should report claims directly to AON, who would then report the claims to Westrope, who would in turn notify the insurers.[4] During Mannschreck's deposition, the following exchange occurred:

---

**2. Duties in the Event Of Occurrence, Offenses, Claim[,] or Suit**

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. . . .

* * *

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifies of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

(c) You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal paper received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit" . . . .

[4] As described in *Altman Mgt Co*, unpub op at 5, "[F]rom 2008 until 2010, Altman directly submitted claims to Westrope, with a copy to [AON]. However, that process changed when Westrope complained to [AON] that [Altman] had not included specific information needed to process a claim. Going forward, Westrope required [AON] to submit claims on [Altman]'s behalf."

-4-

*Q*. So we took the deposition of Wayne Brinkman and he described to us that he was advised that claims should be reported to AON by the insured in this case, [Altman], and then passes along [sic], they couldn't be reported directly to Westrope.

\* \* \*

*A*. That is how we would prefer it, yes.

*Q*. . . . Okay. Where did that policy come from?

*A*. We are not [Altman's] technically we're not [Altman's] broker and we are not the insurance company.

*Q*. I don't think I understand your answer. So my question was where did that policy come from, where did handling it like that come from?

*A*. Me.

*Q*. Okay. And why is that? Why did you make that decision?

*A*. Because we are not technically [Altman's] broker and we are not the insurance company.

*Q*. If you were [Altman's] broker, how would that change things?

\* \* \*

*A*. I'm not [Altman's] broker so they shouldn't be reporting claims directly to us.

*Q*. So your view is they should be reporting claims directly to the broker, in this case AON?

*A*. That or the insurance company.

*Q*. Okay. So you told Mr. Brinkman that claims should be reported to AON, AON can pass them along to Westrope and you would pass them along to the insurer?

*A*. That is one way to handle it.

*Q*. Okay. But you told them that?

*A*. Yes.

*Q*. Is there another way that you told them that you would handle it?

*A*. Specific to the Otero case?

*Q.* Yes, sir.

*A.* We didn't have discussions specific to the Otero case.

*Q.* What about specific reporting of claims to Tudor for [Altman]?

*A.* I don't know that we had any discussions other than advising him that we do not accept claims directly from insureds, in this case.

Leslie Armstrong, Tudor's associate vice president of claims, testified that in nearly all prior 50 to 60 claims he handled, the process followed that chain: Altman reported the claims to AON, AON sent them to Westrope, and Westrope notified Tudor.

Tudor brought a motion for summary disposition pursuant to MCR 2.116(C)(10). It argued that Altman failed to "see to it" that Tudor was timely notified, and that this breach prejudiced it because a default was entered and it was unable to defend the suit on the merits. Tudor also argued that the claim notice emailed by Altman to AON did not serve as notice to it because AON was not an agent of Tudor; rather, AON was an agent of Altman pursuant to the AON-Altman agreement. Additionally, Tudor argued that Westrope was not its agent for purposes of notification because its agreement with Westrope did not authorize Westrope to accept notice on its behalf. Both Otero and Altman responded.

In her response, Otero argued that Westrope was Tudor's agent and that Westrope's direction to notify AON, rather than itself, was binding on Tudor. She also argued that even if Westrope was not Tudor's actual agent for purposes of claim notice, Westrope had apparent authority to advise Altman how to provide notice and accept claims on behalf of Tudor. Otero further argued that Tudor's policy did not provide for any specific mechanism for provision of notice, which left Altman "to guess" the appropriate method and to rely on Westrope's instructions, i.e. to send the notice to AON.

In its response, Altman made the additional argument that in addition to being its express agent, AON was also Tudor's agent by implication.

In granting Tudor's motion for summary disposition, the trial court concluded that Westrope was Tudor's agent but that AON was not Tudor's agent. According to the court:

> Westrope's undisputed verbal direction to [Altman] to serve only AON is not attributable to Tudor. There is no evidence Tudor held Westrope as having the authority to direct service of process in any manner, i.e. that [Altman] could not serve Tudor or [Altman] had to serve a particular entity.

> Secondly, Tudor has never held out that Westrope had any authority to amend the contract by a course of conduct to effectuate service in a particular manner contrary to the language of the contract.

> Thirdly, the chain of service, *coupled with* Westrope's directive to serve AON does not create an agency relationship between AON and Tudor. There is

no evidence Tudor authorized Westrope to direct [Altman] as to the manner of service of process to bind Tudor.

Finally Tudor's knowledge of the chain of service utilizing AON is insufficient to create an agency relationship between Tudor and AON. The evidence shows [that] Tudor knew [Altman] used AON and Westrope to effectuate timely contractual notice to Tudor. Knowledge alone does not constitute mutual agreement that can amend the contract to provide for untimely service or restrictive service in a manner contrary to the contract.

* * *

There is no course of conduct which amended [Altman's] contractual burdens to provide "practicable notice to Tudor" of an occurrence or written notice of the Summons and Complaint. The notice was not accomplished and Tudor was prejudiced because of the failure to provide the contractual notice.

## II. ANALYSIS

### A. AGENCY

On appeal, appellants make two arguments. First, that Altman's notice to AON was sufficient to constitute notice to Tudor because AON was Tudor's express, implied, or apparent agent. Second, that because Westrope was Tudor's express or apparent agent and Altman had followed Westrope's direction by sending the notice to AON, it constituted notice to Tudor.[5] We reject both contentions.[6]

---

[5] There are three types of agency relationships recognized under Michigan law: (1) actual express agency; (2) actual implied agency; and (3) apparent agency. See *Alar v Mercy Mem Hosp*, 208 Mich App 518, 528; 529 NW2d 318 (1995) (stating that the "authority of an agent to bind a principal may be either actual or apparent. Actual authority may be express or implied") (citation omitted); *Logan v Manpower of Lansing, Inc*, 304 Mich App 550, 559; 847 NW2d 679 (2014) (defining an agency as "a fiduciary relationship created by express or implied contract or by law, in which one party (the agent) may act on behalf of another party (the principal) and bind that other party by words or actions") (quotation marks and citations omitted). In this case, the trial court and the parties refer to actual express agency as actual agency.

[6] This Court reviews de novo a trial court's decision to grant summary disposition under MCR 2.116(C)(10). *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012). The existence of an agency relationship and the scope of the relationship are generally questions of fact. *Caldwell v Cleveland-Cliffs Iron Co*, 111 Mich App 721, 732; 315 NW2d 186 (1981). Where there is a disputed question of agency, any testimony, either direct or inferential, tending to establish agency creates a question of fact for the jury to determine. *Meretta v Peach*, 195 Mich App 695, 697; 491 NW2d 278 (1992).

### 1. AON as Agent of Tudor

To the degree that appellants are arguing that AON was Tudor's express agent, its claim fails as there is no evidence, either documentary or testimonial, to suggest that these two parties entered into an explicit principal/agent relationship. *Breighner v Mich High Sch Athletic Ass'n, Inc*, 255 Mich App 567, 582-583; 662 NW2d 413 (2003) (stating that an agency relationship can be created by express contract). Appellants acknowledge that AON is an agent of Altman, but argue that it should be deemed a dual agent of both Altman and Tudor. "It is well established that an independent insurance agent or broker is an agent of the insured, not the insurer." *Auto-Owners Ins Co v Mich Mut Ins Co*, 223 Mich App 205, 215; 565 NW2d 907 (1997). Therefore, when Altman hired AON to find insurance for it and process its claims, AON was acting as an agent of Altman. Relying on *Vargo v Saurer*, 457 Mich 49; 576 NW2d 656 (1998), Otero argues that AON should be deemed as a dual agent of Tudor and Altman. According to the *Vargo* Court, "dual agency occurs when two persons or entities agree to share the services of an individual for a single act." *Vargo*, 457 Mich at 69 (citation omitted). However, appellants offered no evidence of an agreement between Tudor and Altman "to share the services of [AON] for a single act." *Id*. Indeed, the Tudor-Altman policy does not mention AON at all, and as previously discussed, there is no evidence of any relationship between Tudor and AON. As such, appellants' dual agency argument is without merit.

The argument that AON was either an apparent or implied agent of Tudor also fails. "Apparent authority arises where the acts and appearances lead a third person reasonably to believe that an agency relationship exists. However, apparent authority must be traceable to the principal and cannot be established only by the acts and conduct of the agent." *Alar v Mercy Mem Hosp*, 208 Mich App 518, 528; 529 NW2d 318 (1995). "In determining whether an agent possesses apparent authority to perform a particular act, the court must look to all surrounding facts and circumstances." *Meretta v Peach*, 195 Mich App 695, 699; 491 NW2d 278 (1992).

Appellants argue that because Altman always provided notice to Tudor by notifying AON, Tudor was aware of this practice and never objected or directed Altman to do otherwise. However, AON never provided notice directly to Tudor. Moreover, Tudor never took any action to suggest that notice to AON was required at all. The insurance policy does not require Altman to use any particular means of notifying Tudor; it states only that "You must see to it that we are notified as soon as practicable of an 'occurrence' or an offense which may result in a claim." In other words, so long as notice of a claim or suit timely reached it, Tudor was unconcerned with the means by which that was accomplished. The fact that Tudor had accepted notice through Westrope, which received it from AON, does not mean that Tudor was limiting Altman to this mechanism or creating an agency relationship with AON.

We also reject appellants' argument that an implied agency exists between AON and Tudor based on the parties' procedure of forwarding claims to Tudor. In *AFP Specialists, Inc v Vereyken*, 303 Mich App 497, 507-508; 844 NW2d 470 (2014), we discussed the circumstances that would lead to the creation of an implied agency:

> An implied agency must be an *agency in fact*; found to be so by reasonable deductions, drawn from *disclosed facts or circumstances*. An agency cannot arise by implication if the alleged principal expressly denies its existence,

but it may arise from acts and circumstances within [the alleged principal's] control and permitted over a course of time by acquiescence or in recognition thereof. Thus . . . the facts and circumstances giving rise to an implied agency must be (1) known to the alleged principal, (2) within the control of the alleged principal, and (3) explicitly acknowledged or at least acquiesced in by the alleged principal. . . . Specifically, an implied agency must rest upon acts and conduct of the alleged agent known to and acquiesced in by the alleged principal prior to the incident at bar. In sum, the facts and circumstances giving rise to an implied agency must be known to and acquiesced in by the alleged principal before the action of the alleged agent may bind the alleged principal. Moreover, the implied agency must be based upon facts . . . for which the principal is responsible . . . . [Quotation marks and citations omitted.]

Although the agreement between AON and Altman clearly states that AON was an agent of Altman, there is no agreement between Tudor and AON stating that AON represents Tudor. Appellants offered no evidence to demonstrate that Tudor manifested an intent to have AON act on its behalf. Other than the evidence that AON was in the email chain where Tudor accepted notice of claims using the parties' method of delivery, there is no other evidence of any relationship between Tudor and AON. Finally, there is no evidence demonstrating that Tudor exerted control over AON, nor is there evidence that AON had the authority to bind Tudor. Granted that Tudor was aware of the method of delivery and acquiesced to it, there is no evidence that Tudor was in control of the delivery process. To the contrary, the testimony revealed that Mannschreck made the decision that service should be effectuated that way because Westrope was not Altman's broker.

### 2. Westrope as Agent of Tudor

Appellants argue that because Westrope was an express or apparent agent of Tudor, Mannschreck's statement that Altman should deliver notices directly to AON was binding on Tudor, and that notice to AON was sufficient to trigger Tudor's duty to indemnify.

Plaintiff's argument is unconvincing. First, as to express agency, plaintiff has offered no evidence of an agreement by which Tudor established or suggested that Westrope had the authority to limit the means by which Altman could "see to it" that Tudor was notified of claims or occurrences. The agreement between Tudor and Westrope gives Westrope authority to act as its agent in offering Tudor policies to persons seeking coverage, and it makes Westrope responsible for payment of premiums. However, it makes no reference to Westrope as having authority to determine how an insured should provide notice to Tudor; rather, it states that "this agreement does not permit [Westrope] to bind [Tudor]." There was also no testimony that Tudor had provided such authority orally. Indeed, there is nothing in the contract between Tudor and Westrope or in the policy or elsewhere in the record suggesting that Westrope's agency extended to accepting notice of claims on behalf of Tudor. No one from either Westrope or Tudor testified that the agency encompassed acceptance of notice on behalf of Tudor. Therefore, we conclude that the theory of actual express agency was unsupported and so properly dismissed.

Appellants also argue that because Tudor accepted notice that it received through the Altman-AON-Westrope chain, that an apparent agency arose and that plaintiff, therefore, had reason to conclude that Westrope's instructions constitutes instructions from Tudor. We disagree.

There was no evidence that Tudor acted in such a manner that a reasonable person would conclude that Westrope's direction to notify AON, rather than Westrope, meant that Tudor had given such direction or that notice to AON constituted notice to Tudor. Tudor had no objection to receiving notice through the Altman-AON-Westrope chain, but its actions did not suggest that Altman was required to follow Westrope's directions as the means of providing notice to it. Indeed, there is no evidence that Tudor took any action that would suggest that the *only* means by which it would accept notice was through the Altman-AON-Westrope chain. Even Westrope's Vice-President testified that he advised Altman that it could either notify AON or provide direct notice to Tudor.

Accordingly, the trial court did not err in granting Tudor's motion for summary disposition.

## B. TIMELINESS OF NOTICE CLAIM TO NATIONAL UNION

Appellants also argue that the trial court erred in granting National Union's motion for summary disposition, contending that timely notice was provided to National Union and that National Union was not prejudiced. We disagree.[7]

The notice of claim provision in National Union's policy provides, in relevant part, as follows:

G. Duties in the Event of an Occurrence, Claim or Suit

1. You must see to it that we are notified as soon as practicable of an **Occurrence** that may result in a claim or **Suit** under this policy. To the extent possible, notice should include:

a. how, when and where the **Occurrence** took place;

b. the names and addresses of any injured persons and any witnesses;

the nature and location of any injury or damage arising out of the **Occurrence.**

---

[7] The construction and interpretation of an insurance contract is a preliminary question of law that this Court reviews de novo. *Allstate Ins Co v Muszynski*, 253 Mich App 138, 140-144; 655 NW2d 260 (2002).

2. If a claim is made or **Suit** is brought against any **Insured** which is reasonably likely to involve this policy, you must notify us in writing as soon as practicable.

National Union's policy contains two notice of claim provisions: (1) notice of an occurrence, and (2) notice of suit. The trial court properly found that Altman did not breach the notice of occurrence provision because there was no evidence to show that Altman was aware of Otero's accident (i.e., the occurrence) until suit was filed some 17 months later. Regarding the notice of suit, the evidence conclusively shows that Altman was served with Otero's summons and complaint on June 20, 2011, which it forwarded to AON the same day. National Union was not notified of the lawsuit until May 30, 2013, a year and nine months after the service of Otero's summons and complaint and nine months after the trial court denied the motion to set aside the default. In fact, although AON first notified National Union of the lawsuit in May 2013, it was not until September 2, 2013, that Altman actually provided National Union with notice of Otero's lawsuit.

In *Motor State Ins Co v Benton*, 35 Mich App 287, 290; 192 NW2d 385 (1971), "[t]he clause 'as soon as practicable' [was] interpreted to mean 'a reasonable time, dependent upon the facts and circumstances of the case.' " Further, there are no Michigan cases interpreting the phrase "reasonably likely to involve" the excess policy. However, in *Evanston Ins Co v Stonewall Surplus Lines Ins Co*, 111 F 3d 852, 861 (CA 11, 1997), the 11th Circuit Court offered some guidance:

> Notice is required only when it is "reasonably likely" that the claim will be found to have a value in excess of the primary insurance limits. "Reasonable to whom? The insured's appraisal will have to control unless, as a matter of law, it is unreasonable.
>
> The fact is that excess carriers are not interested in receiving notice of every claim against their insureds. The excess insurer does not undertake to defend the insured. Consequently, the excess insurer is not interested in every accident, but only in those serious enough to involve it. *Excess policies, therefore, usually require an assured to give notice of claims that appear "likely to involve' the excess.*
>
> Under the notice provision of the excess policy "the exercise of some judgment on the part of the assured in evaluating the case is contemplated." (Herbert C. Brook, 21 *Ins. Counsel J.* 131 (April, 1954). This standard requires the insured to base its judgment regarding the amount of the claim against it upon sound reasons. Mere guesswork will not be enough; ignorance is no defense. An insured cannot be heard to say it did not know when it did not inquire. The insured must use diligence and take appropriate steps to make an informed judgment regarding the nature and amount of the claim. [Emphasis added.]

Appellants' argument that Altman could not have known that Otero's claim was reasonably likely to exceed Tudor's $1 million limit is unavailing. Otero's complaint alleged that she suffered life-threatening exposure to carbon monoxide poisoning, was intubated for one

week, and that brain damage was identified. The complaint also alleged that before Otero was discharged from the hospital, she rapidly deteriorated, was non-responsive, had seizures, and had trouble controlling her bowels. Altman has offered no explanation as to why it delayed in notifying National Union of the claim. Even after the default was entered on July 25, 2011, and the order denying the motion to set aside the default was entered on August 14, 2012, Altman still delayed in giving notice to National Union. At most, Altman should have known that the excess policy might be implicated when Otero moved for default judgment in the amount of $1 million, and the trial court stated that the issue of damages was to be resolved by a factfinder. The extent of Otero's injuries and the entry of the default was sufficient to put Altman on notice that the lawsuit was "likely to involve" the excess policy issued by National Union. Therefore, Altman breached the notice provision contained in the policy.

However, for National Union to be relieved of its obligations under the policy, it is not enough that Altman breached the notice provision under the policy; rather, it must also show that it was prejudiced by the breach. Appellants' argue that there was no prejudice to National Union because it was in the exact same position from August 14, 2012, when the trial court denied the notion to set aside the default, to September 24, 2013, when Altman gave notice of the Otero lawsuit to National Union. National Union argues that a conflict of law issue exists and that Florida law should govern. This could matter as under Florida law, there is a presumption of prejudice to insurer when an insured fails to give timely notice of a claim to the insurer. *Bankers Ins Co v Macias*, 475 So 2d 1216 (Fla, 1985). Michigan, on the other hand, provides that the insurance company must establish actual prejudice. *Koski v Allstate Ins Co*, 456 Mich 439, 444; 572 NW2d 636 (1998) (holding that "it is a well-established principle that an insurer who seeks to cut off responsibility on the ground that its insured did not comply with a contractual provision requiring notice immediately or within a reasonable time must establish actual prejudice to its position.").

We need not reach the conflict of law issue because National Union was prejudiced by the entry of the default. Because of the entry of the default, National Union was denied the opportunity to participate in defending the lawsuit, engage in discovery, present evidence relative to liability, present any meritorious defenses to the lawsuit, cross-examine witnesses at trial, or participate in the arbitration proceeding. Therefore, National Union suffered actual prejudice as a result Altman's delay in providing notice of Otero's lawsuit.

Accordingly, the trial court did not err in granting National Union's motion for summary disposition.

Affirmed.

/s/ Brock A. Swartzle
/s/ Douglas B. Shapiro
/s/ Mark T. Boonstra